SYUFY ENTERPRISES, Plaintiff,

v.

AMERICAN MULTICINEMA, INC.,
AMC Film Management, Inc., and
Durwood, Inc., Defendants.

No. C–79–3052 WHO.

United States District Court,
N.D. California.

July 28, 1982.

Alioto & Alioto, Joseph M. Alioto, Lawrence G. Papale, San Francisco, Cal., for plaintiff.

Robert C. Hackett, Mohr, Hackett, Pederson & Blakley, P.C., Phoenix, Ariz., Benjamin H. Parkinson, Ackerman, Johnston, Campbell & Parkinson, San Francisco, Cal., Alan K. Benjamin, Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION

ORRICK, District Judge.

In this difficult and complex antitrust action in which two motion picture exhibitors, namely, Syufy Enterprises ("Syufy"), as plaintiff and counterdefendant, and American Multi-Cinema, Inc. and its related entities ("AMC"), as defendants and AMC as counterplaintiffs, charged each other with violating Section 2 of the Sherman Act by attempting to monopolize and monopolizing the exhibition of first-run motion pictures in the San Jose, California, area, a jury, following a five-week trial, returned a verdict in favor of AMC and assessed damages (before trebling) against Syufy in the amount of $1,006,410. For the reasons which follow, Syufy's post-trial motions for judgment *non obstante veredicto,* or, in the alternative, for a new trial on the counterclaim and, additionally, for a new trial on its Section 2 claim against AMC are DENIED.

### I

### A

Syufy is an independent motion picture theatre operator which owns and operates over 150 motion picture exhibition screens located in various western states. Defendants are three related corporations: AMC, which owns and operates motion picture exhibition screens located throughout the

United States; AMC Film Management, Inc. ("Film Management"), which acts as a film buying and booking agent for AMC and for various other theatre owners; and Durwood, Inc. ("Durwood"), a holding company which owns a controlling interest in both AMC and Film Management.

Since April, 1973, both Syufy and AMC have owned and operated motion picture exhibition screens in Santa Clara County, California, the focal point of this lawsuit. There are at present thirty major walk-in motion picture theatres ("hardtops"), with a total of seventy-one screens, being operated in Santa Clara County. AMC operates the Oakridge, Saratoga, Old Mill, and Sunnyvale Theatres, a total of twenty-four screens; and Syufy operates the Century 21, Century 23, Century 24, Century 25, and the Century Almaden Theatres, for a total of fifteen screens, and also operates four drive-in theatre complexes in the area. The remaining hardtop theatres in Santa Clara County are operated by United Artists Theatres (eight screens), Blumfield Theatres (eight screens), Jack Gunsky (three screens), and Mann Theatres (one screen).

Syufy and AMC compete with each other for the right to license first-run motion picture films from distributors and to exhibit such films in theatres situated in Santa Clara County, among other places. A brief description of the manner in which motion picture films are licensed for exhibition is helpful in understanding the claims raised by the parties in this case.

The right to exhibit motion picture films under copyright is licensed to exhibitors by distributors on terms and conditions contained in license agreements. Motion pictures can be licensed either by bid or by negotiation. When a distributor licenses a motion picture on a bid, it first sends out a bid invitation to the exhibitors in a particular geographical area announcing the availability date of the motion picture being released. The bid invitation often includes the minimum film rental (calculated as a percentage of the gross theatre admission receipts), and minimum terms (such as a specified minimum film rental and/or advance film rental) that will be acceptable to the distributor, and may also specify whether the picture is being offered on an "exclusive" basis, so that only one theatre in a particular area can exhibit the picture during a given run, or on a "nonexclusive" ("day and date") basis. The distributor may in turn accept one or more bids, or reject all bids and rebid the picture, or enter into negotiations with interested exhibitors for the licensing of that motion picture.

In order to earn a profit for the exhibitor, a theatre must gross more than its operating expense and the cost of film rental paid to the distributor. Thus, in bidding for a particular film, the exhibitor must first evaluate the potential gross of the motion picture and submit a bid offer of film rental to the distributor high enough to obtain the award of the picture, but not so high as to incur losses in exhibiting the film.

On October 31, 1979, Syufy brought this action for damages and injunctive relief pursuant to 28 U.S.C. § 1337, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Sections 4, 12 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 15, 22, 26, and California Business and Professions Code Sections 16,600 et seq., 16,720 et seq. and 17,000 et seq. The gravamen of the complaint is that, commencing in April, 1973, when AMC opened its first theatre in Santa Clara County, AMC and its related entities combined among themselves and conspired with various motion picture distributors to restrain trade in the exhibition of first-run motion pictures in Santa Clara County and to monopolize the relevant market through conduct violative of Sections 1 and 2 of the Sherman Act and state unfair competition laws.

The complaint sets forth eight specific actions and/or courses of conduct allegedly engaged in by defendants with the purpose and intent of destroying Syufy's ability to compete for first-run motion pictures in Santa Clara County:

1. Hiring away Syufy's head film buyer in order to learn Syufy's confidential business operations and to disrupt and cripple

Syufy's theatre operations in Santa Clara County;

2. Strategically surrounding Syufy's theatres in Santa Clara County with defendants' new theatres having eighteen screens and defendants' newest theatre, scheduled to open in February, 1980, with an additional six screens;

3. Consistently operating their Santa Clara County theatres below cost;

4. Subsidizing their Santa Clara County theatres, where defendants are competing against Syufy, with the profits obtained from their theatres and operations located outside of the greater San Jose metropolitan area where the defendants have either little or no competition;

5. Subsidizing the losses incurred by defendants in their theatres in competition with Syufy by funds generated out of defendants' nationwide network of theatre operations;

6. Establishing pocket monopolies by organizing buying and booking combines of exhibitors for the purposes of eliminating competition, creating noncompetitive profits, and funding predatory below cost bidding in areas where independent exhibitors, such as Syufy, refuse to become a part of defendants' combine policy;

7. Attempting to force and forcing independent exhibitors into splitting agreements; and

8. Block booking motion pictures in their theatres.

Syufy alleges that defendants, through the above-described conduct, have had and will continue to have the effect of substantially restraining competition in the distribution and exhibition of first-run motion pictures in Santa Clara County, and of increasing admission prices for the movie-going public.

On November 26, 1979, AMC filed its counterclaim for damages and injunctive relief for violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. AMC alleged that Syufy had at all relevant times possessed monopoly power in both indoor and drive-in exhibition of major films in the San Jose zone of Santa Clara County, and that Syufy used its monopoly power and conspired with various distributors and exhibitors to restrain trade and eliminate competitors, including AMC, in this market by engaging in the following conduct:

1. Syufy individually, and in combination, conspiracy, and agreement with the co-conspirators, has excluded AMC from the opportunity to exhibit first-run motion picture films in Santa Clara simultaneously with the exhibition thereof at motion picture theatres owned and operated by Syufy through a system of unreasonable and unlawful clearances. Syufy has made as a condition of its bid or negotiation to license first-run motion picture films that AMC's theatres in Santa Clara be excluded from any simultaneous run thereof. The co-conspirators have agreed with, acquiesced in, and aided and abetted, Syufy in implementing and effectuating such unlawful system of clearances.

2. Syufy, in combination, conspiracy and agreement with the co-conspirators, has consistently and systematically entered into license agreements for the exhibition of first-run motion picture films in Santa Clara by the terms of which, among others, Syufy has agreed to pay substantially less as film rental than would have been paid by AMC pursuant to bids submitted by AMC for the exhibition of such films.

3. Syufy and the co-conspirators have by combination, conspiracy and agreement engaged in a systematic and concerted practice and pattern of excluding AMC from the opportunity to compete fairly with Syufy for the right to exhibit first-run motion picture films in Santa Clara. Such practices include, but are not limited to, the rigging of bids and sham awarding to Syufy of license agreements by the co-conspirators. The co-conspirators have made available to Syufy prior to licensing of films all information regarding sealed bids made by AMC therefor, and the co-conspirators have granted Syufy the opportunity of licensing such films by meeting the terms and conditions of sealed bids submitted by AMC.

4. Syufy has conditioned its licensing of first-run motion picture films at its drive-in theatres in Santa Clara upon the co-conspirators' awarding license agreements to Syufy for the exhibition of films at Syufy's hardtop theatres under terms and conditions substantially inferior to those terms and conditions under which AMC has offered to license such films for exhibition by AMC.

B

During the course of this litigation, the Court made several important rulings that substantially narrowed the scope of the lawsuit and the number of claims that were ultimately submitted to the jury.

On July 17, 1980, the Court issued its pretrial order, setting March 3, 1981, as the date for the termination of discovery and for the filing of pretrial statements, including the identification of any proposed amendment to the pleadings, in accordance with Local Rule 235–7. The trial date was set for March 23, 1981, but was subsequently continued to November 30, 1981.

On April 10, 1981, five weeks *after* the discovery cutoff date, the Court held a further pretrial conference, during which it determined that Syufy had failed to comply with the provisions of the Court's pretrial order governing the conduct of discovery. The Court found that Syufy had failed to respond adequately to numerous interrogatories and requests for documents and, most importantly, had failed to provide specific information underlying Syufy's claim for conspiracy under Section 1 of the Sherman Act. The Court, pursuant to Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure, imposed monetary sanctions upon Syufy, and ruled that it would limit the evidence that could be introduced at trial in support of Syufy's Section 1 claim and would strip certain issues from the trial because of Syufy's unjustifiable and repeated failure to afford adequate discovery. R.T. p. 6, line 20—p. 8, line 14.

On April 24, 1981, Syufy moved for leave to amend its complaint in order to include, *inter alia,* the identification of six major motion picture distributors as alleged "co-conspirators" and certain additional acts and/or courses of conduct allegedly engaged in by the defendants and the "co-conspirators." After still another hearing on May 29, 1981, the Court denied the motion for leave to amend, on the grounds that Syufy's delay in seeking to amend the complaint was inexcusable because Syufy possessed the relevant facts prior to the discovery cutoff date, and that the proposed amendments would significantly broaden the scope of the lawsuit, necessitating additional discovery, imposing unjustifiable hardship upon defendants, and coming dangerously close to "trial by ambush." R.T. p. 3, line 13—p. 11, line 7.

On June 23, 1981, Syufy filed a second lawsuit, No. C–81–2642 WHO, based upon a new complaint substantially identical to the first complaint, but setting forth the allegations which Syufy had sought to include by way of amendment. On September 18, 1981, the Court, noting that the second lawsuit appeared to be an attempt to circumvent the Court's prior rulings, denied Syufy's motion to consolidate the two actions for trial, and granted defendants' motion to stay all discovery in the second case pending entry of judgment in the first case.[1] R.T. p. 12, lines 7–13; p. 23, lines 20–24.

On November 6, 1981, the Court granted defendants' motion for summary judgment on Syufy's Section 1 claim, ruling that the three named defendants, AMC, Film Management, and Durwood, constituted a single business entity, and thus that the threshold requirement of Section 1 of a plurality of actors had not been met. On November 20, 1981, the Court granted defendants' motion for partial summary judgment on any damage claim arising out of the licensing and

---

1. On May 28, 1982, following the trial of the first action, the Court reiterated its concern that allowing Syufy to proceed with the second lawsuit would effectively permit it to circumvent the sanctions earlier imposed by the Court, and suggested that counsel for AMC move to dismiss the second lawsuit. R.T. p. 3, line 24—p. 5, line 17. Thus far, counsel has not responded to the Court's suggestion.

exhibition of motion picture films that were bid subsequent to October 31, 1979, and denied defendants' motion for summary judgment on the allegations contained in Section 11(f) of the complaint pertaining to defendants' alleged plan to destroy Syufy in retaliation for Syufy's refusal to participate in an alleged buying and booking combine.

At the close of all the evidence at trial, the Court granted Syufy's motion for a directed verdict on AMC's counterclaims under Section 1 of the Sherman Act and Section 3 of the Clayton Act, on the grounds that AMC had not presented sufficient evidence of these claims to warrant their submission to the jury. The Court took under submission Syufy's motion for a directed verdict on its Section 2 claim against defendants and on AMC's Section 2 counterclaim.

On January 7, 1982, Syufy's Section 2 claim that AMC attempted to monopolize the exhibition of first-run films in Santa Clara County, and AMC's Section 2 claim that Syufy had a monopoly and attempted to monopolize the exhibition of major first-run films in the San Jose zone, were submitted to the jury. On January 8, 1982, the jury returned a verdict for AMC and against Syufy on the affirmative complaint, and for AMC and against Syufy on the counterclaim, and awarded AMC $1,006,410 in damages. Judgment was entered on the verdict on February 11, 1982, and Syufy's motions for judgment *non obstante veredicto,* or, in the alternative, for a new trial on the counterclaim, and for a new trial on the affirmative complaint followed.

## II

■ The standards for granting a judgment *non obstante veredicto* are the same as those for granting a directed verdict, and the well-settled rule is that a court may grant a motion for judgment *non obstante veredicto* only if, without passing upon the credibility of the witnesses, it finds that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, does not provide "substantial evidence" in support of

the verdict. *See, e.g., In Re Data General Antitrust Litigation,* 529 F.Supp. 801, 812 (N.D.Cal.1981); *Inglis v. ITT Continental Baking Co.,* 668 F.2d 1014, 1026 (9th Cir. 1981). "Substantial evidence" has in turn been described as more than a "mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Where the evidence is "substantial," the Court is not free to weigh the evidence for itself or to reach a result that it finds more reasonable. *Inglis, supra.*

■ By contrast, the standard for granting a new trial permits the Court to consider the weight of the evidence and the credibility of the witnesses, and the Court may set aside a verdict, even if it is supported by substantial evidence, if it is contrary to the clear weight of the evidence or is based upon evidence which is false, or whenever in the exercise of sound discretion the trial judge thinks his action necessary to prevent a miscarriage of justice. *Id.* at 1027.

## III

Application of the legal standards set forth above to the evidence presented in this case leads to the conclusion that Syufy's motion for judgment *non obstante veredicto,* or, in the alternative, for a new trial on AMC's counterclaim for monopoly and attempt to monopolize must be denied.

## A

With respect to the monopoly claim, Syufy first contends that, given the existence of a competitive bidding market, and absent evidence of complicity between exhibitors and distributors, the unilateral action of an exhibitor cannot give rise to liability for monopoly as a matter of law. Syufy's position rests on the rationale that competitive bidding assures all exhibitors in a given area equal access to films, and that an exhibitor in such a market cannot be held liable for monopoly, even if he is awarded

100 percent of the films, because it is the distributor, and not the exhibitor, who ultimately decides where motion pictures will be exhibited. The Court rejects this novel legal theory, raised for the first time in Syufy's post-trial motion, noting that such a rule has never been articulated in the case law and that, in any event, it is the very question as to whether each exhibitor is able to receive fair consideration for his bid which lies at the heart of this lawsuit.

■ Syufy further contends that, even if a finding of monopoly power is not precluded as a matter of law in this case, the verdict cannot stand because there was a critical failure of proof as to each of the elements necessary to establish a claim for monopoly. The essential elements that must be proved to establish a claim for monopolization under Section 2 of the Sherman Act are: (1) the possession of monopoly power in a relevant market; (2) the willful acquisition or maintenance of such power; and (3) causal antitrust injury. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Greyhound Computer Corp. v. IBM*, 559 F.2d 488 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

■ With regard to the first element, the possession of monopoly power in a relevant market, the Court finds that AMC's definitions of the relevant product and geographic markets were supported by substantial evidence, and that AMC presented sufficient evidence of Syufy's market share and its power to support a jury finding of monopoly power. The Court instructed the jury as to Syufy's definition of the relevant market, "the exhibition of first-run films in Santa Clara County, from the Southern Boundary of the San Jose Zone to the San Mateo County Boundary," and AMC's definition of the relevant market, "major first-run film licensed for exhibition in the San Jose Zone, or alternatively, the San Jose Zone and Sunnyvale," and explained to the jury that it was free to accept the definition proposed by either of the parties or to develop its own definition of the relevant

markets based on the evidence. Substantial evidence was adduced at trial in support of AMC's position that "major" first-run films, those twenty to forty films which the industry anticipates will have superior box office grossing potential, constitute an economically significant, industry-recognized product submarket, and that the San Jose zone is an appropriate geographic market, based upon commercial realities of motion picture exhibition and encompassing the area in which Syufy and AMC were engaged in substantial competition.

AMC established the existence of Syufy's monopoly power in the relevant market through evidence showing that Syufy's market share was at all relevant times greater than 62 percent, and expert testimony suggesting that Syufy's market share was sufficiently high to justify an inference of monopoly power, given the fragmented distribution of the remaining market shares among competing distributors. AMC also demonstrated that Syufy possessed an essential hallmark of monopoly power, the power to exclude competition, through evidence that Syufy had successfully created barriers to entry by other major first-run film exhibitors at a time when the San Jose market had grown substantially and Syufy had more than doubled its own capacity.

■ With respect to the second element of a monopolization claim under Section 2, namely, the willful acquisition or maintenance of monopoly power, AMC presented substantial evidence at trial demonstrating that Syufy had engaged in anticompetitive conduct for the purpose of maintaining its monopoly power and eliminating competition in the market. Such conduct included Syufy's use of its monopoly power in the drive-in market to induce distributors to award exclusive hardtop runs by the submission of conditional drive-in bids; Syufy's use of predatory bidding to obtain exclusive runs; threats made by Syufy's owner, R.J. Syufy, against AMC; and Syufy's acquisition of its largest competitor, the Mann Theatre, shortly before the commencement of this lawsuit.

■ With respect to the third element required to establish monopoly, namely, causal antitrust injury, Syufy contends that AMC has failed to present any competent evidence demonstrating that AMC earned lesser profits as a proximate cause of Syufy's alleged monopolization, and that the damage award must be set aside as speculative because AMC did not present any evidence of damages sustained on specific films at specific theatres. AMC's proof of fact and amount of damage rested on a comparability study which demonstrated that AMC's theatres in the relevant market were substantially less profitable than comparable AMC theatres in the markets of Mountain View, California, and Phoenix, Arizona. AMC presented testimony at trial establishing the comparability of these markets, and suggesting that the only plausible reason for the relatively poor performance of AMC's theatres in the San Jose market was the inability of those theatres to obtain a fair share of top first-run films. Under the applicable law, AMC was required to establish a reasonable probability that it lost profits at its San Jose theatres were proximately caused by Syufy's anticompetitive conduct, and was not required to negate all possible alternative explanations for such losses. *Greyhound, supra.* The Court finds that AMC introduced sufficient proof to permit the jury to infer that AMC sustained injury as a proximate result of Syufy's monopolization of major first-run films in the San Jose zone.

■ With regard to the amount of damage, the Court rejects Syufy's argument that a damage award is inherently speculative unless based upon a picture-by-picture analysis. The use of the "yardstick" or comparison method of proving damages was first upheld in *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), where the Court held that damages could be calculated by comparing the success of a given theatre before and after the onset of the anticompetitive conduct, or by comparing the performance of other theatres in different but comparable markets, where the decline in profits is not shown to be attributable to other causes. This comparison method has been approved in numerous antitrust cases since *Bigelow: see, e.g., Shannon v. Crowley,* 538 F.Supp. 476 (N.D.Cal.1981); *Fox West Theatres Corp. v. Paradise Theatre Building Corp.,* 264 F.2d 602 (9th Cir.1958); 11 Von Kalinowski, Antitrust Laws and Trade Regulation § 81.-09(5). Furthermore, in the absence of any decisions explicitly holding that the comparison method of proving damages is limited to cases involving complete exclusion from the market and is inappropriate in cases where the plaintiff could or did bid for individual films, the Court rejects Syufy's argument that AMC's comparability study should be held insufficient to establish the amount of damages under the circumstances presented here.

### B

■ Syufy's arguments with regard to AMC's claim for attempted monopolization under Section 2 of the Sherman Act are directed exclusively to the sufficiency of the evidence and in large part reiterate the arguments made with respect to AMC's monopolization claim, already rejected by this Court. The essential elements of a claim for attempt to monopolize under Section 2 are: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Inglis, supra.* Although these three elements are separate and distinct, it is clear that the existence of a dangerous probability of success may be inferred from evidence of specific intent to control prices or destroy competition, and predatory or anticompetitive conduct directed towards that end. *Id.* Indeed, the most recent decision in this Circuit to address the issue indicates that all three elements of a claim for attempt to monopolize may be satisfied by evidence of conduct that is clearly threatening to competition or is clearly exclusionary. *Twin City Sportsservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291 (9th Cir.1982).

Syufy's anticompetitive conduct, which was discussed in the context of Syufy's willful acquisition and maintenance of its monopoly power, above, and which took the form of using its monopoly position in the drive-in market to induce distributors to award exclusive hardtop runs, predatory bidding to obtain exclusive runs, and the acquisition of its largest competitor, the Mann theatre, was in itself sufficient to permit the jury to infer that Syufy possessed the specific intent required for attempt to monopolize. Moreover, AMC presented direct evidence of Syufy's anticompetitive intent in the form of threats by R.J. Syufy to run AMC out of town if AMC did not either sell out to Syufy or get out of San Jose. The probability that Syufy would be successful in obtaining a monopoly could in turn have been inferred from the evidence of Syufy's anticompetitive intent and conduct, and was further demonstrated by proof of Syufy's market power, which was always in excess of 62 percent. It has previously been demonstrated that AMC suffered causal antitrust injury attributable to Syufy's anticompetitive conduct. Thus, the Court finds that AMC has met its burden of presenting substantial evidence in support of each of the elements required to establish a claim for attempted monopolization in violation of Section 2 of the Sherman Act.

Having determined that Syufy is not entitled to judgment *non obstante veredicto* on AMC's counterclaim for monopolization, the Court further finds that Syufy's alternative motion for a new trial on the counterclaim must be denied, because it cannot be said that the verdict is contrary to the clear weight of the evidence or that allowing the verdict to stand would result in a miscarriage of justice.

Finally, Syufy urges this Court to set aside the verdict and grant a new trial on its claim against AMC, Film Management and Durwood for attempt to monopolize in violation of Section 2 of the Sherman Act. Syufy had every opportunity to present its claim to the jury, based upon evidence which included proof of defendants' alleged plan to eliminate competition among film exhibitors through the organization of buying and booking cooperatives. The jury could reasonably have found that the evidence of AMC's alleged intent to destroy Syufy as a competitor was unconvincing, or that defendants never engaged in conduct directed towards accomplishing that intent. In any event, the Court does not find that the evidence presented at trial in support of Syufy's Section 2 claim was so clear and overwhelming as to justify granting a new trial.

IV

For the reasons stated above, the Court finds that the jury verdict is fully supported by the law and the evidence in this case, and that the judgment entered upon the verdict must stand. With respect to AMC's counterclaim for monopolization in violation of Section 2 of the Sherman Act, the Court rejects Syufy's argument that a finding of monopoly on the basis of an exhibitor's unilateral action in a bidding market is precluded as a matter of law, and finds that AMC presented substantial evidence at trial in support of each of the essential elements of a monopolization claim, namely, the possession of monopoly power in a relevant market, the willful acquisition or maintenance of such power, and causal antitrust injury. Similarly, with respect to AMC's counterclaim for attempt to monopolize in violation of Section 2, the Court rejects Syufy's arguments, which are directed exclusively to the sufficiency of the evidence, and finds that each of the elements necessary to establish a claim for attempt to monopolize, namely, specific intent to control prices or destroy competition, predatory or anticompetitive conduct, and dangerous probability of success, were proven by substantial evidence. Finally, with respect to Syufy's Section 2 claim against AMC for attempt to monopolize, the Court finds that, on the basis of the evidence presented at trial, the jury could reasonably have concluded that AMC did not engage in anticompetitive conduct causing injury to Syufy.

Accordingly, IT IS HEREBY ORDERED that Syufy's motions for judgment *non obstante veredicto* or, in the alternative, for a new trial on AMC's counterclaim under Section 2 of the Sherman Act, and for a new trial on its Section 2 claim against AMC, are denied.