**SYUFY ENTERPRISES,**
Plaintiff-Appellant/Cross-Appellee,

v.

**AMERICAN MULTICINEMA, INC., AMC Film Management Inc., and Durwood, Inc., Defendants-Appellees/Cross-Appellants.**

Nos. 83–2725, 84–1728.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 13, 1984.

Decided Feb. 25, 1986.

As Amended on Denial of Rehearing and Rehearing En Banc July 14, 1986.

Joel Linzner, Michael N. Khourie, Khourie & Crew, Joseph Alioto, Alioto & Alioto, San Francisco, Cal., for plaintiff-appellant/cross-appellee.

Robert C. Hackett, Mohr, Hackett & Pederson, Phoenix, Ariz., for defendants-appellees/cross-appellants.

Before CANBY and NORRIS, Circuit Judges, and STEPHENS,* Senior District Judge.

NORRIS, Circuit Judge:

In this antitrust case involving the exhibition of major feature films in the San Jose area, a jury returned a general verdict in favor of appellees American Multicinema, Inc. (AMC)[1] on its counterclaim against appellant, Syufy Enterprises. The jury awarded AMC damages totaling $1,006,421. Judgment was entered for that amount trebled and for attorney's fees.[2]

The case went to the jury on AMC's claims that Syufy monopolized, attempted to monopolize and conspired to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982). Syufy's principal arguments on appeal relate to the sufficiency of the evidence to support the general verdict in favor of AMC.[3] Syufy also challenges the admission of certain evidence.

Syufy contends that the district court erred in failing to grant a judgment *non obstante veredicto*. The standard for determining the propriety of a judgment n.o.v. is the same for district and appellate courts. *California Computer Products v. International Business Machines, Inc.*, 613 F.2d 727, 734 (9th Cir.1979). It is also the same as the standard for determining the propriety of a directed verdict: whether, "viewing the evidence as a whole, there is substantial evidence present that could support a finding ... for the nonmoving party." *Id.* (quoting *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Washington v. United States*, 214 F.2d 33, 41 (9th Cir.), *cert. denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954).

Four distinct theories of Section 2 violations by Syufy were submitted to the jury. We hold that the evidence was sufficient to support a jury finding that Syufy violated Section 2 with respect to two of the theories: that Syufy monopolized and attempted to monopolize the San Jose hardtop major film exhibition market. We further hold that the evidence was inadequate to support a verdict for AMC with respect to the remaining two theories: that Syufy violated Section 2 by leveraging its monopoly power in the San Jose drive-in theater market and that Syufy conspired to monopolize the major film hard-top exhibition market. Finally, we reject Syufy's arguments that the district court erred in admitting certain evidence.[4]

---

* The Honorable Albert Lee Stephens Jr., Senior United States District Judge for the Central District of California, sitting by designation.

1. AMC's corporate structure includes three related entities. AMC owns and operates the exhibition screens; AMC Film Management, Inc. acts as a film buying and booking agent for AMC theatres; and Durwood, Inc. owns a controlling interest in both AMC and AMC Film Management.

2. The jury also found in favor of AMC on the antitrust claims raised by Syufy in its complaint. Syufy does not appeal that part of the verdict. In addition, the district court granted a directed verdict in favor of Syufy on AMC's claim that Syufy conspired to restrain trade in violation of Section 1 of the Sherman Act.

3. Syufy does not contest the jury instructions on appeal.

4. Syufy also argues that in setting the rate of interest on the judgment, the district court erred in applying retroactively both California (Cal. Civ.Proc.Code § 685.010 (West Supp.1986)) and federal (28 U.S.C. § 1961 (1982)) statutes enacted after the date of judgment. We need not

Part I of our opinion addresses AMC's theory that Syufy monopolized the hardtop market. Part II considers AMC's theory that Syufy leveraged its monopoly power in the drive-in market to gain a competitive advantage in the hardtop market. Parts III and IV evaluate the attempt to monopolize and conspiracy to monopolize theories. In Part V, we consider whether the general verdict may be affirmed as attributable to one of AMC's two viable theories. Part VI responds to Syufy's claim that the trial court erred by admitting evidence concerning Syufy's acquisition of the Mann Theater. In Part VII we address Syufy's contention that AMC's damage estimates were flawed.

## I. THE THEORY THAT SYUFY MONOPOLIZED THE MAJOR FILM HARDTOP EXHIBITION MARKET

AMC's monopolization claim stems from Syufy's extensive ownership of both drive-in and hardtop movie theaters in the San Jose area. During the relevant period, Syufy owned all four drive-in theater complexes in the San Jose market. Syufy also operated a total of fifteen screens in large domed hardtop theaters, each with a seating capacity of 680–900 people. Syufy's domed hardtop theaters were known as "event" theaters because of their wide screens, state of the art sound, high ceilings and rocking chair seats.

During the same period, AMC owned and operated four theater complexes in the San Jose area. Each complex housed six auditoriums with seating capacities of approximately 250 people. AMC's theaters were generally located within shopping malls and lacked many of the amenities found in Syufy's hardtop theaters. But AMC's theaters were conveniently located and offered greater selection of movies than Syufy's theaters. They also charged, on average, a lower admission price.

AMC claims that Syufy used its dominant position in the ownership of both hardtop and drive-in theaters to monopolize the exhibition of major films in the San Jose area. AMC advanced two discrete theories in support of this claim. AMC's first monopolization theory is that Syufy effectively deprived AMC of any chance to compete for major motion pictures in the San Jose area by using its dominant position in the market to license such pictures on an exclusive basis.

To establish monopolization under Section 2 of the Sherman Act, "a plaintiff must prove: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal 'antitrust' injury." *Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 698 F.2d 1377, 1382 (9th Cir.), *cert denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *see also California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir.1979). Thus, we must decide whether AMC presented substantial evidence with respect to each of the three elements of a monopolization claim.

### A. Monopoly power.

Monopoly power—the first element of monopolization—is the power to control prices or exclude competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). We begin our analysis of the issue of market power with a discussion of market definition and then turn to the question whether there is substantial evidence that Syufy had monopoly power within the relevant market.[5]

reach this issue because we vacate the district court's judgment and remand for a new trial. Clearly, any judgment entered subsequent to this opinion will be governed entirely by 28 U.S.C. § 1961.

**5.** We utilize this simplified structural approach—rigidly bifurcating market definition from the question of power within the defined market, *see generally* L. Sullivan, *Handbook of the Law of Antitrust* 33–35 (1977),—because it has been adopted by the parties. We do not imply that this is the exclusive way to approach the question of market power.

#### 1. Market definition.

■ We begin by considering the definition of the relevant market within which Syufy allegedly possessed monopoly power. *See United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) ("*Alcoa*"). Relevant market is a factual issue which is decided by the jury; the court is not permitted to account for witness credibility, weigh the evidence, or reach a different result it finds more reasonable as long as, viewing the evidence in a light most favorable to the nonmoving party, the jury's verdict is supported by substantial evidence. *Los Angeles Memorial Coliseum Comm'n v. N.F.L.,* 726 F.2d 1381, 1392 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

AMC defined the relevant market as the market for exhibition of industry anticipated top-grossing motion pictures in the San Jose area. Syufy does not dispute the geographic component of this definition—the San Jose area. Nor does it dispute limiting the product market definition to hardtop theaters. The only aspect of AMC's market definition that Syufy disputes is the limitation of the relevant product market to the exhibition of major films, more specifically to industry-anticipated top-grossing films. Syufy argues that this market definition is ex post facto and ad hoc, and that all first run films are in substantial competition with each other.

■ In evaluating Syufy's challenge, we begin with the principle that assessment of a product market definition must take into account whether products excluded from the definition are "interchangeab[le] in use" with those included in the market and whether there is "cross-elasticity of demand" between excluded and included products. · *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956). In economic terms, we might recharacterize Syufy's argument as follows: all first run films are interchangeable in use and the price and availability of any one film will affect the demand for all other films. Top-grossing films, Syufy argues, are simply those films that prove to be highly successful in the market place, but they possess no special characteristics that differentiate them from less successful films from an ex ante perspective. Syufy also argues that limiting the product definition to top-grossing films has the effect of irrationally and unfairly penalizing the exhibitor with the prescience to book films that later prove to be big hits with the movie-going public.

AMC's rejoinder is that Syufy's argument mischaracterizes the product market definition. AMC points out that it did not define the market as simply top-grossing films, but as *industry anticipated* top-grossing films. AMC argues that these films can be differentiated from other first run films from an ex ante perspective because they have larger budgets, "name" stars and directors, larger advertising budgets, command large guarantees, and possess other distinctive characteristics which can be identified before the film is released. In economic terms, the viability of AMC's product market definition depends on the proposition that anticipated top-grossing films are not interchangeable with other films in the eyes of consumers and that price increases or supply constrictions for such films do not result in a shift in consumption patterns to other films. In legal terms, the question is whether the films excluded from the definition are "interchangeab[le] in use" with those included in the market and whether there is "cross-elasticity of demand" between excluded and included products. *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956). In more colloquial terms, the viability of the proposed definition depends on the argument that if the price for admission to *E.T.* goes up, audiences will not flock to *My Dinner with Andre.*

■ We conclude that there is sufficient evidence in the record to permit a rational jury to conclude that industry anticipated top-grossing films constitute a distinct product market. The evidence indicates

that approximately thirty pictures a year are identifiable as "anticipated top grossing films" on the basis of such criteria as national advertising support, longer playtimes, guaranteed rentals, famous stars, directors and producers, booking in first class theatres, and lucrative terms offered for the pictures by exhibitors. AMC compiled a list of the industry anticipated top-grossing films based on bidding materials submitted by both Syufy and AMC. Although AMC did not present direct evidence going to the "cross-elasticity of demand" between this limited class of pictures and other films, the jury could reasonably have concluded from the evidence presented that the industry anticipated top-grossing films were not in substantial competition with other films.

### 2. Monopoly power within the relevant market.

Syufy contends that even if AMC's market definition is valid, AMC failed to prove that Syufy possessed monopoly power within that market. Syufy argues that the only evidence probative of its market power is that it had a 60–69% share of the market, which Syufy claims is insufficient, standing alone, to establish that it had monopoly power. Under existing antitrust case law, the question whether a 60–69% market share is sufficient, standing alone, to support a finding of monopoly power is a perplexing one. Ever since Judge Learned Hand laid down his rule of thumb in the *Alcoa* case that a ninety percent market share "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not," *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945), courts have struggled with the question of the minimum market share necessary to establish monopoly power. In *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court, acknowledging that "[t]he existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market" (*id.* at 571), held that a market

share of 87% could sustain a finding of monopoly power. But as far as we know, neither the Supreme Court nor any other court has ever decided whether a market share as low as 60–69% is sufficient, standing alone, to sustain such a finding.

AMC argues that we need not decide that abstract question because the record contains evidence other than Syufy's market share that is probative of Syufy's power to control prices or exclude competition in the San Jose market. AMC relies upon *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), for the proposition that a 45–70% market share, if accompanied by other relevant factors, may support a finding of monopoly power. In *Sunkist*, this court observed that "it is now well settled that market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power." *Id.* at 1204. We held that when Sunkist's market share, which ranged from 45% to 70%, was coupled with such factors as highly fragmented competition and Sunkist's acknowledged control over the supply market, the jury's finding of monopoly power could be sustained.

In the case before us, as in *Sunkist*, Syufy's 60–69% market share is accompanied by a fragmentation of competition. One of AMC's expert witnesses computed market shares for both first run films and the 100 top-grossing films for the period 1975 through 1980. These calculations indicated that while Syufy's share ranged from 71.8% to 54.7%, no competing exhibitor in the San Jose area ever had a greater share than 24.7% and in some years the top competitor's share was below 12%.

In addition to the factors of Syufy's market share and the fragmentation of competition, there was evidence of a third factor that the jury could have considered in finding that Syufy had monopoly power in the relevant market—barriers to prospective competitors seeking entry to the market. There was testimony, for example, that

while exclusive runs were becoming less and less common in other parts of the country, they persisted in the San Jose market, and that exclusive runs were probably a deterrent to the establishment of more theaters in the area. Still another indicator of barriers to entry was the evidence that Syufy extracted excessive clearances from distributors of certain films.[6] Viewed in the light most favorable to AMC, the evidence would permit a rational jury to find that barriers to entry existed in the San Jose market.

Finally, as evidence that Syufy had monopoly power, AMC cites the testimony of AMC's expert witness, Maurice Silverman. His qualifications as an expert witness were based upon years of experience relating to the film industry in his capacity as an antitrust lawyer in the United States Department of Justice.[7] His conclusion that Syufy possessed monopoly power in the relevant market was based upon a cursory study of the San Jose film exhibition market, including an analysis of the market share statistics and the demographics of the area. On cross examination, Silverman admitted that he had failed to consider such basic indicators of monopoly power as barriers to entry, price differentials, and profit margins. Moreover, his study of the market did not include important variables such as clearances, attendances figures, or even the number of screens within the region. Reporter Transcript ("R.T.") at 3303–39. Despite these shortcomings, the jury was entitled to give Silverman's testimony some weight.

We conclude, consistent with *Sunkist*, that when the evidence is viewed in the light most favorable to AMC, Syufy's market share of 60–69%, when coupled with other evidence of additional factors, is adequate to support a jury determination of monopoly power in the market defined as the exhibition of anticipated top-grossing films in the San Jose area. Here the additional factors include the fragmentation of competition, the presence of barriers to entry, and the existence of excessive clearances. Moreover, the jury in this case could reasonably have assigned some weight to the testimony of AMC's expert witness, Maurice Silverman.

## B. Willful Acquisition or Maintenance of Monopoly Power.

We have no difficulty finding substantial evidence in the record that Syufy willfully maintained its monopoly power in the San Jose area. Daniel Marks, AMC's film buyer, testified that, in his opinion, Syufy had been engaging in buying clearances which were excessive, defined as clearances that encompass a greater geographical area than is justified for legitimate competitive reasons. R.T. at 2787–89. The clearance for a particular theater is excessive if it reaches beyond the geographic zone within which the theater draws significant numbers of customers. Marks's testimony— that Syufy had submitted bids with large guarantees and lucrative terms in order to obtain clearances that were excessive—is probative of the willful maintenance of monopoly power. Although Syufy can point to evidence in the record indicating that its clearances were not excessive, it is for the jury, not this court, to resolve such evidentiary conflicts.[8]

6. We discuss the evidence on excessive clearances below in section B of this part of our opinion.

7. Syufy objects for the first time on appeal to the admission of Silverman's testimony. Syufy argues that his opinion testimony had no basis in the evidence and further that his testimony should have been excluded because the identification of Silverman as an official antitrust enforcer prejudiced the jury. AMC replies that Syufy failed to object at trial and that hence it has waived its objection under Fed.R.Evid. 103. Syufy has fallen far short of demonstrating that the admission of Silverman's testimony was plain error. Despite the shortcomings of Silverman's testimony regarding the particular relevant market in question, he qualified as an expert in antitrust matters, and although his testimony about the San Jose film exhibition market was of marginal value, it was not plain error to admit it.

8. Marks testified that in his opinion the Syufy domed theaters and AMC's Oakridge theaters were not in substantial competition with each other. Although Marks may have contradicted himself by stating that the AMC's Old Mill theater, which is located farther away from the

## C. Causal Antitrust Injury.

In addition to Mark's testimony that Syufy had engaged in the practice of buying excessive clearances, Marks also testified that AMC had been injured as a result of such clearances. This testimony was not challenged by Syufy on cross-examination or otherwise. Marks, as AMC's film buyer, was qualified to give his opinion on this issue. Although Marks's testimony was not supported by specific examples, it stands as sufficient evidence to support a jury finding of causal antitrust injury.

In conclusion, we hold that there is substantial evidence to support a jury verdict in favor of AMC on its first Section 2 monopolization theory: that Syufy monopolized the market for the exhibition of industry anticipated top-grossing films in the San Jose area.

## II. THE THEORY THAT SYUFY LEVERAGED ITS MONOPOLY POWER IN THE DRIVE-IN MARKET IN ORDER TO GAIN A COMPETITIVE ADVANTAGE IN THE HARDTOP MARKET

AMC's second monopolization theory is that Syufy used its undisputed monopoly power in the San Jose drive-in theater market as leverage to influence the licensing of films in the hardtop theater market.[9] AMC claims that Syufy leveraged its drive-in monopoly power in a way that restricted AMC's ability to license major motion pictures for exhibition in its hardtop theaters. AMC points to restrictive bids submitted by Syufy for its drive-in theaters as evidence of this leverage power. Such bids offered to play a particular motion picture in its drive-in theaters on the condition that the film could play only one hardtop theater in the area. For example, Syufy submitted a bid to the distributor of *The Electric Horseman* to have that film play in Syufy's Capitol Drive-in Theater. The bid contained the following condition: "First to play with one hardtop". This condition, if accepted by the distributor, would have restricted the licensing of *The Electric Horseman* to a single hardtop theater in the San Jose market. Because Syufy owned a majority of the large hardtop theaters in the San Jose area as well as all the drive-ins, a distributor acceptance of the restricted bid for *The Electric Horseman* could readily have led to an exclusive run of the film at a Syufy hardtop theater.

AMC's leverage theory is analagous to one advanced by the government in *United States v. Griffith*, 334 U.S. 100, 103–04, 68 S.Ct. 941, 943–44, 92 L.Ed. 1236 (1948). There the government claimed that four film exhibitors who owned all the theaters in one town leveraged their monopoly position to influence the licensing of films in another town where the film exhibition business was highly competitive. The Supreme Court stated in *Griffith:*

> A man with a monopoly of theaters in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors....
>
> The consequence of such a use of monopoly power is that films are licensed on a non-competitive basis in what would otherwise be competitive situations.

334 U.S. at 107–08, 68 S.Ct. at 945–46. Thus, under the *Griffith* analysis, Syufy would violate Section 2 if it acquired "exclusive privileges" in the hardtop theater market by using its monopoly of drive-in theaters as a "trade weapon" against its hardtop competitors.

---

Syufy domes than either the Saratoga or Oakridge theaters, had some competitive effect on Syufy's domed theaters, it is the province of the jury to judge credibility and choose from conflicting inferences. R.T. at 3120.

9. The district judge's instructions to the jury discussed the leveraging theory as a component of the general section 2 monopolization claim. But the legal and evidential requirements of the two theories are so distinct (e.g., the existence and impact of monopoly power in another market) as to merit separate treatment.

And yet, a restrictive Syufy bid standing alone does not prove a claim of monopolization. To demonstrate causal antitrust injury from Syufy's use of leverage, AMC must also prove that one or more of Syufy's restricted bids were accepted by distributors, and that as a result Syufy gained a competitive edge in the hardtop market in the form of an exclusive run in a Syufy hardtop theater. Thus it is not sufficient for AMC to prove that Syufy made the restrictive bid on *The Electric Horseman;* it must also prove that the bid was accepted and that as a result *The Electric Horseman* was booked into a Syufy hardtop theater for an exclusive run. In short, AMC must prove that Syufy succeeded in its alleged scheme to leverage its monopoly power in the drive-in market to acquire "exclusive privileges" in the hardtop market.

■ We agree with Syufy that AMC's leverage claim fails for lack of proof that Syufy succeeded in acquiring a single exclusive hardtop run by submitting restricted bids on films to exhibit in its drive-in theaters.[10] The only evidence [11] relevant to AMC's leverage theory is a list of nine films for which Syufy allegedly made restricted bids. Defendants' Exhibit 8135. The list is sketchy in detail and vaguely cross-referenced to other supporting exhibits. When closely examined on a film-by-film basis, it fails to yield substantial evidence to support AMC's Section 2 leverage claim. As to seven of the nine films on the list, there is no evidence of distributor response one way or the other.[12] As to one of the two remaining films—*The Electric Horseman*—the evidence shows that the restricted bid was rejected by the distributor. The evidence shows that a restricted

bid for only one of the nine films—*The China Syndrome*—was accepted. But the evidence also shows that *The China Syndrome* never played at a Syufy hardtop theater. Thus the evidence fails to prove that Syufy ever succeeded in leveraging its monopoly power in the drive-in theater market to obtain exclusive licenses for films in the hardtop market. The record simply fails to yield any evidence of causal antitrust injury. We hold that AMC's leverage theory fails for lack of proof.

## III. THE ATTEMPTED MONOPOLIZATION CLAIM

■ AMC relies upon two discrete theories in support of its claim that Syufy attempted to monopolize the hardtop theater market in violation of Section 2 of the Sherman Act. The first theory was a variation of its failed leverage theory. AMC claims that Syufy attempted to monopolize the hardtop theater market by attempting to use its monopoly power in the drive-in market to license films in Syufy's hardtop theaters on an exclusive basis. This theory fails for the same reason—lack of evidence of causal antitrust injury—that AMC's monopolization claim based upon a leverage theory fails.

■ AMC's second theory of attempted monopolization is more straightforward: that Syufy attempted to monopolize the hardtop market. It is clear that a case of attempted monopolization cannot be sustained in the absence of any of the following elements: (1) specific intent to monopolize, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful

---

**10.** Thus, we need not enter into the debate concerning the anticompetitive effects of leverage. *Compare* 5 P. Areeda & D. Turner, *Antitrust Law* ¶ 1129c, 1134b (1980), and R. Bork, *The Antitrust Paradox* 140–44, 372–75 (1978), *with* L. Kaplow, *Extension of Monopoly Power Through Leverage,* 85 Colum.L.Rev. 515 (1985).

**11.** AMC's brief does include citations to other portions of the record that are alleged to support the leverage theory. But we find these citations to be totally unhelpful. One citation to

page 2494 of the Reporter's Transcript leads us to testimony that bears no relationship to the proposition AMC claims it supports. The other citation, to pages 3257–58 of the Transcript, leads us to testimony by Silverman expressing a legal opinion that *if* Syufy successfully used leverage it would be guilty of monopolization.

**12.** In addition, four of the nine films were not included in the product market defined by AMC, which was the only market in which AMC claimed causal antitrust injury and damages.

purpose, and (3) causal antitrust injury. *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1382 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1027–29 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474–75 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488, 504 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).[13]

### A. Specific Intent

As evidence of specific intent to monopolize, AMC cites the testimony of its chief executive officer, Mr. Durwood, concerning a conversation he had with Mr. Syufy, the chief executive officer of Syufy. The relevant portions of the testimony follow:

Q. And can you tell us what Mr. Syufy told you and what you told Mr. Syufy?

A. Well, we had—we had met in Los Angeles when we discussed trying to buy—making us an offer of the depreciated book value, and so on, which didn't excite me too much.

Q. That's what you told us about this morning, correct?

A. Yes.

Q. Can you concentrate on this phone call that you just identified?

A. On the phone call he said—his voice hit a crescendo. He got pretty high decible count. He threatened to sue. He's going to start a massive building program against us if we didn't sell out.

San Jose is his town. He said he had 20 million dollars in cash and he was going to use it to build theatres against us.

Q. Is that something that appears in your notebook, which is exhibit No. 50, sir?

A. Yes, sir.

Q. Did you write those notes down on or about the time of the phone call?

A. As soon as I could get calmed down after hearing this conversation.

Q. Is there anything else you can recall of this conversation with Mr. Syufy?

A. No. He reiterated he wanted the eight domes exclusive, he wasn't going to share any product with us. If we didn't get out of San Jose, he was going to run us out. And he had 20 million dollars he could do it with.

R.T. at 1774–75.

Although Mr. Syufy's remarks to Mr. Durwood are arguably consistent with a simple desire to succeed in free and open competition, the jury could reasonably have inferred a specific intent to monopolize from the threat to run AMC out of town.

### B. Anticompetitive Conduct

As to the second element of attempted monopolization—anticompetitive conduct—the Marks testimony that Syufy had bought excessive clearances, discussed in Part I–B above with respect to AMC's hardtop monopolization claim, also serves as substantial evidence of anticompetitive conduct. If Syufy did indeed buy more clearance than needed for legitimate competitive reasons, then it engaged in conduct that would have been indisputably anticompetitive.

### C. Causal Antitrust Injury

We agree with AMC that there was adequate evidence before the jury to support a finding that antitrust injury was caused by

13. The question whether "dangerous probability of success" is an element of attempted monopolization appears to have generated a measure of confusion in this circuit. *Compare Lessig v. Tidewater Oil Co.*, 327 F.2d 459 ("dangerous probability of success" not an element of attempted monopolization) *with Transamerica Computer Co., Inc.*, 698 F.2d 1377, 1382 (9th Cir.1983) ("dangerous probability of success" is an element) and *California Computer Prods., Inc.*, 613 F.2d at 736 (same). Because of its large market share, Syufy cannot seriously argue that AMC's attempted monopolization claim fails on the ground that AMC failed to prove "dangerous probability of success." For this reason, we need not address the question whether proof of "dangerous probability of success" is required.

Syufy's anticompetitive conduct in obtaining excessive clearances. The Marks testimony offered with respect to causal antitrust injury on the hardtop monopolization claim is also substantial evidence of causal antitrust injury with respect to the attempted monopolization claim.

In sum, we hold that the district court did not err in denying a judgment n.o.v. on AMC's attempted monopolization claim.

## IV. CONSPIRACY TO MONOPOLIZE CLAIM

The final theory of liability submitted to the jury on AMC's counterclaim was that Syufy conspired with film distributors to monopolize the San Jose market in violation of Section 2 of the Sherman Act. At trial, the district court submitted the Section 2 conspiracy claim to the jury even though it granted a directed verdict on AMC's Section 1 conspiracy claim.[14] Because AMC did not cross-appeal the directed verdict on the Section 1 claim, we are faced with an unusual situation in that we must review a Section 2 conspiracy claim which is unaccompanied by a Section 1 conspiracy claim.[15] As Professors Areeda and Turner have observed,

> [E]very combination or conspiracy that offends antitrust policy can easily be held to be an unreasonable restraint of trade, without the need for considering the additional complexities that flow from using the § 2 monopoly concept. There is therefore no need whatever to try to define the content of the § 2 conspiracy.

3 P. Areeda & D. Turner, Antitrust Law ¶ 839 (1978). Although we are not required in the case before us to decide the question whether a Section 2 conspiracy is always actionable under Section 1, we are required by the unusual posture of this case "to define the content of the Section 2 conspiracy."

■■■ Our task is complicated because the nature of AMC's Section 2 conspiracy claim is murky at best. AMC claims it proved a conspiracy to monopolize between Syufy and the major film distributors, but fails to specify whether it is talking about a single grand conspiracy involving all the major distributors and Syufy, or about six separate conspiracies, each one involving a single distributor and Syufy. In any case, we hold that the district court should have granted Syufy's motion for judgment n.o.v. with respect to the Section 2 conspiracy to monopolize claim because there is no evidence that any of the distributors, in licensing films to Syufy, knew or even should have known that Syufy would use the film licenses for monopolistic purposes. Nor is there any showing that any of the distributors shared with Syufy a common purpose in monopolizing the hardtop theater market in the San Jose area.

As we read the cases, a supplier who licenses a product to another does not join the licensee in a conspiracy to monopolize merely because the licensee turns around and exploits the license for its own monopolistic purposes. Some courts have said that a specific intent to monopolize is required to make one a Section 2 conspirator. *See J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 796 (5th Cir.1983); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). In *United States v.*

---

**14.** On appeal, Syufy claims that the district court submitted the Section 2 conspiracy claim to the jury inadvertently because it overlooked the directed verdict it had granted on the Section 1 claim. The record is clear, however, that the district court acted deliberately in submitting the Section 2 conspiracy claim to the jury. It did so after counsel for Syufy called the court's attention to the directed verdict on the Section 1 claim. We also note that appellant did not object to jury instructions on the Section 2 conspiracy claim.

**15.** Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade ... is declared to be illegal." 15 U.S.C. § 1 (1982). The relevant portion of Section 2 reads, "Every person who shall ... combine or conspire with any other person or persons, to monopolize any part of commerce shall be deemed guilty of a felony." 15 U.S.C. § 2 (1982).

*Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the Supreme Court held that acquiescence in conduct with knowledge that it was anticompetitive was sufficient to establish a Section 1 conspiracy. *Id.* at 146–47, 68 S.Ct. 915. But we know of no authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic.

In support of its conspiracy claim, AMC cites evidence that distributors accepted bids from Syufy requesting excessive clearances. But there is no evidence that any distributor had any reason to know when accepting Syufy bids that the requested clearances were excessive for the San Jose market. AMC also cites in support of its Section 2 conspiracy claim the evidence of Syufy's attempts to condition the licensing of films in its drive-in theaters on exclusive runs in hardtop theaters. But as we have already pointed out (*see* Part I, *supra* ), the evidence shows that only one such bid was accepted by a distributor and the film involved in that bid was not shown in a Syufy hardtop theater. That evidence is plainly inadequate to support a jury verdict that Syufy and the distributor conspired to monopolize the San Jose film exhibition market.

Finally, AMC argues that San Jose was the only market in which exclusive runs occurred, but cites no evidence connecting this characteristic of the San Jose market to a conspiracy to monopolize between Syufy and any of its distributors.

In conclusion, we hold that the district court erred in denying Syufy's motion for judgment n.o.v. on AMC's conspiracy to monopolize claim.

## V. EVALUATION OF THE GENERAL VERDICT

██ Having decided that the district court should have granted Syufy judgment n.o.v. on two of the four AMC theories submitted to the jury, we must now decide whether the jury verdict should none-theless be upheld on the strength of either of the two surviving theories. As a rule, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962). In *Brocklesby v. United States*, 767 F.2d 1288 (9th Cir.1985), this court was faced with a case submitted to the jury on three theories of liability: strict liability, breach of warranty, and negligence. Citing *Sunkist*, we held that "the judgment must be reversed if any of the three theories is legally defective." 767 F.2d at 1294. Nevertheless, this court has also held that when one but not all of the theories submitted to the jury lacks evidentiary support, "the reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error." *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir.1980). We need not resolve this apparent conflict, because the general verdict in this case does not survive the test enunciated in *Traver.*

The factors to be weighed in exercising discretion were outlined in *Traver* as follows:

> In deciding whether to exercise this discretion, the reviewing court should determine the potential for confusion of the jury which may have resulted from an erroneous submission of a particular claim or cause of action, whether privileges or defenses of the losing party apply to the count upon which the verdict is being sustained so that they would have been considered by the jury with reference to the count, the strength of the evidence supporting the count being relied upon to sustain the verdict, and the extent to which the same disputed issues of fact apply to one or more of the theories in question.

627 F.2d at 938–39.

██ Initially, we note that potential for confusion of the jury in the instant case

was great. The jury was confronted with a complex case involving multiple antitrust theories. Although many of the claims shared common issues of fact, each claim also involved distinctive legal and factual components. We believe there was a substantial risk of jury confusion resulting from the erroneous submission of the leverage theory and conspiracy to monopolize claim.

The next relevant factor under *Traver v. Meshriy* is the strength of the claims that were properly submitted to the jury. This factor also weighs against the exercise of our discretionary power to attribute the general verdict to one of the two theories— monopolization and attempted monopolization of the hardtop major film exhibition market—that were supported by substantial evidence. Our review of the evidence leads us to conclude that AMC's case against Syufy was marginal even with respect to these two theories. AMC relied almost exclusively on the conclusory opinion testimony of its own film buyer, Daniel Marks, to fill in crucial gaps in their evidence. Marks's conclusory testimony that Syufy was buying excessive clearances is hardly strong evidence of Syufy's willful maintenance of monopoly power. Moreover, his testimony that AMC suffered causal antitrust injury from excessive clearances was vague as well as conclusory. In fact, it barely qualifies as substantial evidence to support a jury finding on this critical element of AMC's case. Especially given the lack of supporting data with respect to specific theaters and films, we conclude that AMC did not present to the jury a strong case of either monopolization or attempted monopolization. Accordingly, we hold that this is not an appropriate case under *Traver v. Meshriy* for exercising our discretion to attribute the jury verdict to one of the two AMC theories that were properly submitted to the jury.

## VI. THE CLAIMED ERROR IN ADMISSION OF EVIDENCE CONCERNING ACQUISITION OF THE MANN THEATER

Syufy argues that the admission of evidence concerning Syufy's acquisition of the Town and Country Theatre was prejudicial error. Syufy argues that because the Town and Country Theater was acquired after 1975–79, the period at issue, the acquisition was not relevant. We disagree. First, the evidence was relevant to Syufy's specific intent to monopolize. Behavior after the relevant period could shed light on intentions during that period. The district court gave a cautionary instruction to the jury that the evidence was only to be considered on intent. R.T. at 2812. Second, Syufy opened the door to evidence concerning this transaction by first raising the issue in its questions, R.T. at 1734, and by introducing evidence of AMC's post 1979 conduct. R.T. at 158–59.

## VII. THE BASIS FOR THE AWARD OF DAMAGES

AMC based its calculation of damages on two comparisons. First, based on a comparison between AMC's Oakridge and Saratoga theaters with the Old Mill Theater in Mountain View near the San Jose region, AMC introduced evidence that it lost $2,423,380 in profits. Second, based on a comparison between AMC's San Jose theaters and AMC's Phoenix area theaters, AMC introduced evidence that it lost $1,593,822 in profits. The jury awarded AMC damages in the amount of $1,006,410.

Syufy argues that AMC's damage calculations were flawed for two reasons. First, Syufy argues that damages may not be calculated on the basis of a comparable market, unless the damaged competitor was totally excluded from the market dominated by a monopolist. Syufy relies on *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978), and *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir.1971), to support this contention. As we read these cases, however, neither supports Syufy's challenge to the amount of damages. Both cases held that market comparisons cannot be used to establish the fact of causal antitrust injury unless the monopolist's victim is totally ex-

cluded from the market. *Admiral Theatre Corp.*, 585 F.2d at 893–94; *Dahl, Inc.*, 448 F.2d at 19. Proof of the amount of damages is governed by a less stringent standard of proof than is the fact of injury. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). Syufy cites no authority for the proposition that comparisons may not be used to establish the amount of damage in a market in which the victim of a monopolist competes.

Syufy's second challenge to AMC's damage calculations is based on the contention that the Mountain View and Phoenix markets are not comparable to the San Jose market. Syufy argues that during part of the relevant period, exhibitors in Phoenix engaged in an illegal "split agreement," which Syufy claims was a per se violation of the antitrust laws. Syufy argues that this illegal conduct inflated AMC's Phoenix profits, rendering them an invalid basis for comparison. Comparability is a question of fact. The "split agreement" was in existence for only part of the period of comparison, and there was testimony that the two markets were comparable. It was for the jury to consider Syufy's arguments about the effect of the split on the validity of comparison and to adjust its damage award accordingly. There was sufficient evidence to allow a jury to render a damage award for AMC on the basis of the comparison between San Jose and Phoenix.

In addition, Syufy argues that the Mountain View region is not comparable to San Jose because there was less bidding competition in Mountain View. Again, AMC presented evidence that the two markets were comparable. It is for the jury and not for us to weigh the conflicting evidence. We conclude that AMC presented sufficient evidence to support the damages awarded.

### CONCLUSION

In conclusion, we affirm the district court's order, 555 F.Supp. 418, denying Syufy's motion for judgment n.o.v. with respect to two of the theories submitted to the jury—monopolization and attempted monopolization of the hardtop market. We reverse the district court's order denying Syufy's motion for judgment n.o.v. regarding the conspiracy to monopolize claim. In addition, we hold that there was insufficient evidence supporting AMC's theory that Syufy used its monopoly power in the drive-in market as leverage on the hardtop market. We also hold that this is not an appropriate case for invocation of our discretionary power to affirm a general verdict. Accordingly, we remand to the district court for further proceedings not inconsistent with this opinion with respect to the two theories that were supported by sufficient evidence and for dismissal of the theories not supported by sufficient evidence.

Affirmed in part, reversed in part and remanded.