981 F.2d 1259
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
NUTRI-METICS INTERNATIONAL, INC., a California corporation,
Plaintiff-Counter-Defendant-Appellant,
and
Mulford J. Nobbs, Counter-Defendant-Appellant,
v.
CARRINGTON LABORATORIES, INC., a Texas corporation; Clinton
H. Howard, Defendants,
and
Gigi Enterprises, Inc., a Texas corporation; Bea Behring;
Ramona Pollock; Art Benson,
Defendants-Counter-Claimants-Appellees.
 No. 89-56253.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 9, 1992.
Decided Dec. 22, 1992.
 
 Before POOLE, WIGGINS and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Nutri-Metics International, Inc. ("Nutri-Metics"), a company engaged in the direct sales of skin care products, and its President, Mulford J. Nobbs, appeal a jury verdict in favor of Gigi Enterprises ("Gigi"), Bea Behring, and Ramona Pollock. Shortly after Nutri-Metics had purchased a direct sales skin care business, Avacare, from Carrington Laboratories, Inc. ("Carrington"), Nobbs terminated Behring and Pollock, both former Avacare officials. Subsequently, Behring and Pollock formed Gigi, a competing skin care company.
 
 
 3
 Following the formation of Gigi, Nutri-Metics filed an action against Carrington, Gigi, Behring, and Pollock alleging that Gigi's presence in the skin care market breached the Noncompetition Agreement entered into by Nutri-Metics with Carrington, in violation of various federal and state commerce and contract laws. Gigi responded by filing counter-claims against Nutri-Metics alleging, inter alia, unfair competition, interference with business and contractual relationships, defamation, and infliction of emotional distress.
 
 
 4
 Prior to trial, Carrington was granted partial summary judgment on whether it violated the Noncompetition Agreement when it sold certain products to Gigi, who competed with Nutri-Metics in the skin care industry. Following the court's grant of summary judgment, but prior to trial, Nutri-Metics and Carrington reached a settlement on all claims remaining as between them. Carrington also settled with Gigi during the pendency of the trial on the claims asserted by Gigi against it.
 
 
 5
 Following a two and one-half month trial, a jury returned verdicts in favor of Gigi on its counter-claims against Nutri-Metics. It awarded Gigi $3.5 million in compensatory damages and $2 million in punitive damages. Following the district court's denial of its motions for a new trial and judgment n.o.v., Nutri-Metics filed a timely notice of appeal from the jury verdict and the district court's judgment.
 
 DISCUSSION
 A. Noncompetition Agreement
 1. Summary Judgment
 
 6
 As a threshold matter, Nutri-Metics challenges the district court's grant of partial summary judgment in favor of Carrington. It contends the district court erred when it determined that Gigi and Carrington were not involved in direct sales in violation of the Noncompetition Agreement and granted Carrington's motion for partial summary judgment. Nutri-Metics argues the court's conclusion that Gigi was not involved in direct sales of products manufactured by Carrington was based on the misapprehension that "private label" and "direct sales" were mutually exclusive methods of doing business.
 
 
 7
 We decline to review the merits of the district court's grant of partial summary judgment in favor of Carrington. Having settled with both Nutri-Metics and Gigi pursuant to Fed.R.Civ.P. 41(a)(1)(ii), Carrington is no longer a party to these proceedings. Following the grant of partial summary judgment, Nutri-Metics and Carrington stipulated to a voluntary dismissal with prejudice of all claims. Normally, a plaintiff may not appeal a voluntary dismissal because it is not an involuntary adverse judgment against it. Seidman v. City of Beverly Hills, 785 F.2d 1447, 1448 (9th Cir.1986) (per curiam); accord Plasterers Local Union No. 346 v. Wyland Enters. Inc., 819 F.2d 217, 218-19 (9th Cir.1987) ("[G]enerally a party may not gain review of a stipulated judgment."); Unioil, Inc. v. E.F. Hutton & Co., 809 F.2d 548, 555 (9th Cir.1986) (same), cert. denied, 484 U.S. 822 and 823 (1987).
 
 
 8
 Nor does it appear under Seidman that Nutri-Metics could appeal the grant of partial summary judgment after the entry of dismissal. While it is true that Nutri-Metics could have sought and obtained intermediate review of that judgment under Fed.R.Civ.P. 54(b), its decision to forgo that opportunity and enter into the stipulated judgment dismissing all claims with prejudice effectively rendered a final judgment that was not adverse to Nutri-Metics' interests. See Seidman, 785 F.2d at 1448; Plasterers, 819 F.2d at 218-19. Accordingly, we do not have jurisdiction to review the district court's grant of partial summary judgment.[1]
 
 
 9
 Further, on appeal, Nutri-Metics readily acknowledges that it has abandoned its offensive claims against Gigi and is seeking only to challenge the judgment entered against it pursuant to the jury's verdict in this case. As such, the essence of Nutri-Metics' challenge to the grant of partial summary judgment is the propriety of the admission of that evidence at trial.
 
 2. Admission at Trial[2]
 
 10
 The court's ruling on the partial summary judgment was read to the jury, both during the trial and as part of the instructions. Regardless of the fact that we are precluded from reviewing the merits of the grant of summary judgment, the decision by the court to inform the jury that "[t]he court has found that Gigi and Carrington were not engaged in direct sales prohibited by the Noncompetition Agreement" constituted a separate ruling at trial that is reviewable.
 
 3. Merits
 
 11
 A noncompetition agreement is a restraint of trade contract, subject, at a minimum to statutory and common law rules of contract interpretation.[3] Additionally, California Business and Professions Code § 16600 provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal.Bus. & Prof.Code § 16600. An exception to the strict prohibition of section 16600 is set forth in section 16601, which permits an agreement not to compete made by a party when it is subordinate to the sale of the goodwill of the business or all the shares held in a corporation. See Cal.Bus. & Prof.Code § 16601. The parties do not dispute the inherent validity of the Noncompetition Agreement at issue in this case. Presumably, they agree that the circumstances of their Agreement bring it within the exception set forth in section 16601.
 
 
 12
 Sections 16600 and 16601 simply codify common law. As such, those sections must be construed and interpreted in accordance with the common law decisions concerning noncompetition agreements. See Vacco Indus., Inc. v. Van Den Berg, 6 Cal.Rptr.2d 602, 609 (Cal.Ct.App.1992). California courts have held that a restrictive covenant that attempts to prohibit competitive business activity is invalid per se. See, e.g., Loral Corp. v. Moyes, 219 Cal.Rptr. 836, 844 (Cal.Ct.App.1985); Bosley Medical Group v. Abramson, 207 Cal.Rptr. 477, 479-80 (Cal.Ct.App.1984); Radiant Indus., Inc. v. Skirvin, 109 Cal.Rptr. 96, 97 (Cal.Ct.App.1973). At common law, a restraint against competition was valid to the extent it reasonably provided protection for a valid interest of the party in whose favor the restraint ran. Monogram Indus., Inc. v. Sar Indus., Inc., 134 Cal.Rptr. 714, 718 (Cal.Ct.App.1976). In order to protect a buyer from unfair competition and ensure he receives the full value of his purchase, the purchaser of a business may negotiate and enforce a covenant not to compete with the seller that is reasonable and necessary in terms of time, activity, and territory. Id.; accord Vacco, 6 Cal.Rptr.2d at 609.
 
 
 13
 The relevant provision in the Noncompetition Agreement provided that Carrington shall not:
 
 
 14
 2(a)(i) Directly or indirectly, engage or participate in, and/or conduct, operate or otherwise perform (A) any marketing aspect of the business of Selling Directly cosmetics, vitamins or food supplements of any kind or nature, or (B) any Direct Sales business, operation or activity competitive with any of the businesses, operations or activities described in Paragraph 2(a)(i)(A) hereof;
 
 
 15
 Direct Sales was defined by the Noncompetition Agreement to mean:
 
 
 16
 (b) a marketing program whereby (i) products are sold at wholesale prices to individuals, who in turn, as independent distributors, sell the products directly to consumers, and (ii) rewards are provided to those individuals for recruiting new distributors.
 
 
 17
 Also, the Noncompetition Agreement provided for the following exception to section 2(a)(i) above:
 
 
 18
 2(a)(i)(d) Nutri-Metics understands that Avacare is engaged in, and will continue to be engaged in: (i) pharmaceutical research and development and the marketing of prescription drugs and nonprescription drugs and products developed as a result of such research and development activities; and (ii) the business of processing aloe vera leaves and manufacturing and supplying aloe vera gel and other products (including on a "private label" basis) for wholesalers, who may compete with Nutri-Metics, and Nutri-Metics agrees that the provisions of this Paragraph 2 shall not be deemed to restrict or prohibit Avacare or Howard, as a director, officer, employee, or shareholder of Avacare, or in any other capacity with respect to Avacare, from engaging in any such activities.
 
 
 19
 Although the term "private label" basis is not defined in the Agreement, Carrington explained in its motion for summary judgment that the sale of aloe vera products on a "private label" basis meant the goods were manufactured for a particular customer under that customer's business name/label and sold by the manufacturer to the customer. The manufacture and sales transaction is then completed, and the manufacturer is removed from any involvement in the purchaser's sale of the product. According to Carrington, the manufacturer has no distribution network, and there is no reward system from the manufacturer for recruitment of distributions. Private label transactions involve a straight order and delivery; no rewards are paid by the manufacturer for anything; there are no monetary incentives for a private label purchaser to create a "down-line" distribution network for the manufacturer. Carrington contended that private label transactions were a separate and distinct way for a manufacturer to make and sell products.
 
 
 20
 Nutri-Metics does not seriously argue that Carrington was involved in direct sales when it supplied Gigi with the private label aloe vera products. Carrington sold the aloe vera based products to Gigi under a private label. Nutri-Metics does not contend that Carrington paid rewards or incentives to Gigi for recruiting new distributors, nor does it argue that Gigi sold the products directly to consumers. Additionally, we need not decide whether Gigi was involved in direct sales. Nutri-Metics concedes in its brief that the exception provided for by section 2(a)(i)(d) included sales on a private label basis to companies engaged in direct sales, and that it was common for private label goods to be sold by direct sales. Thus, the only issue before this court concerning the Noncompetition Agreement is whether Carrington violated the Noncompetition Agreement when it sold to a third party, Gigi, who may have been or was engaged in direct sales.
 
 
 21
 Upon turning to the interpretation of the provisions in the Agreement, we are mindful of two firmly established legal principles in California. First, we must strictly construe a noncompetition agreement and limit it to reasonable restraints on trade. See Vacco Indus., 6 Cal.Rptr.2d at 609. Next, if possible, we must interpret the contract in such a way to give effect to each provision and avoid rendering any one provision meaningless. See Cal.Civ.Code § 1641. Although under the Agreement, Carrington is prohibited from directly or indirectly engaging in direct sales in competition with Avacare, provision 2(a)(i)(d) of the Agreement expressly authorizes Carrington to manufacture and supply aloe vera gel and other products, including on a private label basis, to wholesalers who may compete with Nutri-Metics. Nutri-Metics does not dispute that Gigi was a wholesaler who sold to other wholesalers, salons, and catalog suppliers. Although the wholesaler who receives products on a private label basis may ultimately engage in direct sales, private label sales are a separate and distinct way for a manufacturer to make and sell products. Carrington preserved this marketing method by virtue of the exception set forth in provision 2(a)(i)(d).
 
 
 22
 Nutri-Metics' contention that the exception must be read to limit Carrington to the private label sales it was actually engaged in at the time of the Agreement is not persuasive. Absent ambiguity, the contract must be interpreted according to its plain meaning, see Cal.Civ.Code § 1644, giving effect to each provision. Id. at § 1641. The Noncompetition Agreement provided that Carrington would stay completely out of a type of marketing enterprise--direct sales of its own products. When Nutri-Metics purchased Avacare, it received Carrington's direct sales business and a promise that Carrington would not sell Avacare products or use the Avacare multi-level distributors. Additionally, Carrington was restricted from selling a product stamped "Carrington Laboratories Moisture Cream." Nevertheless, Carrington expressly reserved, without limitation, the right to continue selling aloe vera and other products to wholesalers that would place their own name on the label. If Nutri-Metics intention was to limit private label sales, it should have done so expressly. To permit otherwise severely restricts the express rights reserved to Carrington and would be an unreasonable limitation. Consequently, the district court properly determined that Gigi and Carrington were not engaged in direct sales prohibited by the Noncompetition Agreement.
 
 
 23
 According to Nutri-Metics, telling the jury the Noncompetition Agreement was not breached had the effect of eviscerating its defenses to Gigi's counter-claims; namely, that Nutri-Metics' demand for Carrington to stop selling products to Gigi was reasonable because the sales constituted a violation of the Noncompetition Agreement. Additionally, Nutri-Metics charges that the no breach ruling also undermined its competitive privilege defenses because it was used to impeach the expert who testified concerning the reasonableness of Nutri-Metics' contract claims. Relying on Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co., 370 U.S. 19, 29-30 (1962), Nutri-Metics asserts that reversal is required on all counts because the legal theories presented to the jury on the counter-claims were tainted by error and the nature of the verdict in this case makes it impossible to determine the theories relied on by the jury in awarding damages.
 
 
 24
 Evidentiary rulings are reviewed for an abuse of discretion, see Rent-A-Center, Inc. v. Canyon Television & Appliance Retail, Inc., 944 F.2d 597, 601 (9th Cir.1991), and jury instructions viewed as a whole must fairly and adequately cover the issues presented, correctly state the law, and cannot be misleading. See Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988). The district court correctly informed the jury on two different occasions that "Gigi and Carrington were not engaged in direct sales," once during trial and once during the instructions. At trial, Nutri-Metics was permitted a full presentation of its evidence for the purpose of establishing its actions were reasonable because of its good faith belief that Carrington and Gigi were engaged in activities prohibited by the Agreement. Additionally, the jury had to be informed whether there was a breach of the Noncompetition Agreement once the judge properly decided it as a matter of law. Indeed, if the court had determined there was a breach, Nutri-Metics would have absolute defenses available and the jury would have been instructed accordingly. Once the judge accurately resolved that relevant question as a matter of law, it was not error to inform the jury.
 
 B. Privilege Defenses
 1. Demand to Stop Selling
 
 25
 Nutri-Metics contends its statements to Carrington demanding that it stop selling certain products to Gigi were absolutely privileged as a matter of law and could not form the basis of liability for Nutri-Metics. See Cal.Civ.Code § 47(b). Nutri-Metics alleges that the trial court erred when it not only refused to give a limiting instruction to the jury that the statements were absolutely privileged, but also when it ruled that Gigi could rely on those statements in order to establish its claim for interference with economic relationships. We review a district court's interpretation of state law under the same independent de novo standard as we do questions of federal law. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 
 26
 Section 47(b) provides in relevant part that "[a] privileged publication or broadcast is one made ... (b) In any (2) judicial proceeding...." Cal.Civ.Code § 47(b). The principle policy consideration underlying the privilege is "to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." Silberg v. Anderson, 266 Cal.Rptr. 638, 642 (1990). Under California case law, the privilege extends to any communication: 1) made in judicial or quasi-judicial proceedings; 2) by litigants or other participants authorized by law; 3) to achieve the objects of the litigation; and 4) that has some connection or logical relation to the action. Id. Once the requirements are met, section 47(b) is absolute and unaffected by the presence of malice. Because of the absolute nature of the litigation privilege, it is not required that the communication be made for the purpose of promoting the "interest of justice." Id. at 645-46.
 
 
 27
 Although the privilege has been extended to communications preliminary to judicial proceedings, it does not protect all communications made prior to filing. See Lerette v. Dean Witter Organization, Inc., 131 Cal.Rptr. 592, 595 (Cal.Ct.App.1976). When the statement is made in contemplation of legal action, it must have some relation to a proceeding that is actually contemplated in good faith and under serious consideration by a possible party to the proceeding.[4] See Financial Corp. of Am. v. Wilburn, 234 Cal.Rptr. 653, 660 (Cal.Ct.App.1987); Fuhram v. California Satellite Sys., 231 Cal.Rptr. 113, 119 (Cal.Ct.App.1986), disapproved on other grounds in Silberg v. Anderson, 266 Cal.Rptr. 638 (1990); Restatement (Second) of Torts § 586 comment e (1977); see also Premier Communications Network, Inc. v. Fuentes, 880 F.2d 1096, 1102-03 (9th Cir.1989). "The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for [tort actions] when the possibility is not seriously considered." Herzog v. A Co., 188 Cal.Rptr. 155, 158 (Cal.Ct.App.1982) (quotation omitted). A communication not related to a judicial action contemplated for legitimate purposes is not protected by the privilege in section 47(b). Id.
 
 
 28
 We conclude that under the circumstances of this case, the absolute privilege provided for by section 47(b) does not protect Nutri-Metics from liability to Gigi for its cease selling statements made to Carrington. At trial, Gigi asserted that the demand statements were made only in an attempt to eliminate Gigi as a competitor with Nutri-Metics in the skin care business. Nutri-Metics may only resort to legitimate means in order to secure performance under its contract. It is not permitted to attempt to induce the breach of a competitor's contract in order to gain an advantage. Indeed, the Noncompetition Agreement expressly authorized Carrington to engage in private label sales with companies such as Gigi's. Further, whatever rights Nutri-Metics perceived it had under the Agreement could not bind Gigi. Nevertheless, it attempted to prevent Carrington from meeting its legal obligations under its contract with Gigi. We conclude that the pre-litigation demand statements were not related to a potential judicial action for a legitimate purpose and, therefore, the absolute privilege provided for by section 47(b) does not apply.[5]
 
 
 29
 Moreover, even assuming we were to decide the privilege could extend to Nutri-Metics' demand statements under the circumstances of this case, we could not do so as a matter of law. The question would be one for the jury to decide. In this case, the district court apparently gave Nutri-Metics the benefit of the doubt by submitting the question to the jury. See Fuhrman, 231 Cal.Rptr. at 119; cf Costa v. Superior Court, 204 Cal.Rptr. 1, 3 (Cal.Ct.App.1985) (When facts and circumstances under which publication was made are undisputed, the question of privilege may be resolved as a matter of law.). Under the circumstances, it was not error to conclude it was a question of fact and submit it to the jury.[6]
 
 2. Exhibits 49 and 52
 
 30
 Nutri-Metics contends that the contents of two widely distributed letters, Exhibits 49 and 52, were privileged communications as a matter of law and, thus, it was entitled to an appropriate jury instruction. See Cal.Civ.Code § 47(c). Nutri-Metics charges that it was error for the court to submit the question to the jury for a factual determination concerning the existence of the privilege for the communications contained in the letters. Additionally, Nutri-Metics argues that the letter labeled Exhibit 49 was not defamatory as a matter of law, and the letter labeled Exhibit 52 was absolutely privileged under section 47(b) and appropriate instructions were required.
 
 
 31
 (a) Section 47(c)
 
 Section 47(c) provides:
 
 32
 A privileged publication or broadcast is one made: (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.
 
 
 33
 Cal.Civ.Code § 47(c). The term "interested persons" as used in section 47(c) is defined as "a communicator and a recipient with a common interest, although to be protected the communication must be one reasonably calculated to further that interest." Cuenca v. Safeway San Francisco Employees, 225 Cal.Rptr. 852, 857 (Cal.Ct.App.1986) (quotation omitted). California courts have held that "[c]ommunications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons." Id. See also Deaile v. General Tel. Co., 115 Cal.Rptr. 582, 587 (Cal.Ct.App.1974).
 
 
 34
 Nevertheless, the conditional privilege provided for by section 47(c) is lost if the privilege is abused or if the publication was motivated by malice. Cuenca, 225 Cal.Rptr. at 857. Actual malice may be established by proving "the publication was motivated by hatred or ill will ... or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication." Roemer v. Retail Credit Co., 119 Cal.Rptr. 82, 88 (Cal.Ct.App.1975).
 
 
 35
 Exhibit 49 was an executive letter sent by Nutri-Metics on June 12, 1986, one week after Behring and Pollock were terminated, to all Avacare Division Managers and Unit Managers. The letter was sent to Behring and Pollock as well. Likewise, Exhibit 52 was an executive letter sent by Nutri-Metics on November 17, 1986, to all Avacare Division and Unit Managers. The letter was also sent directly to Pollock. Behring received a copy from one of the distributors.
 
 
 36
 At trial, Gigi presented evidence from which a jury could reasonably conclude that Nutri-Metics acted with malice when it distributed Exhibits 49 and 52. Gigi also contested whether the recipients of the letters or the content of the letters fell within the meaning of "interested persons" in section 47(c) as that term is defined. Because these were questions to be resolved by the jury, see, e.g., Cuenca, 225 Cal.Rptr. at 857-61; Deaile, 115 Cal.Rptr. at 586, the district court did not abuse its discretion when it submitted the question of the existence of a qualified privilege under section 47(c) to the jury.
 
 
 37
 (b) Exhibit 49/Defamatory as a Matter of Law
 
 
 38
 Nutri-Metics contends that Exhibit 49 was not defamatory as a matter of law. According to Nutri-Metics, it cannot be defamatory because the alleged defamatory language was an expression of subjective judgment by the speaker and, in any event, it in no way reflected adversely on Behring's or Pollock's characters.
 
 
 39
 Although Nutri-Metics argued vigorously at trial that Exhibit 49 should be afforded the qualified privilege of section 47(c) as a matter of law, it never objected to the admission of Exhibit 49. In addition, Nutri-Metics never requested a directed verdict on Gigi's defamation claim on the basis that Exhibit 49 was not defamatory as a matter of law. Simply put, Nutri-Metics never raised this issue at trial; rather, it is challenging Exhibit 49 on this basis for the first time on appeal. Thus, we decline to exercise our discretion to consider this issue. See In re Wind Power Sys., Inc., 841 F.2d 288, 290 n. 1 (9th Cir.1988).
 
 
 40
 (c) Exhibit 52/Section 47(b)
 
 
 41
 Nutri-Metics next argues that Exhibit 52 was absolutely privileged under section 47(b), and the district court should have instructed that it could not provide the basis for Nutri-Metics' liability to Gigi as a matter of law. According to Nutri-Metics, Exhibit 52 was sent in the midst of intense, prelitigation settlement negotiations with Carrington and, therefore, was privileged.
 
 
 42
 We cannot agree. We conclude that Exhibit 52 does not meet any of the four requirements for extending the privilege. See Silberg, 266 Cal.Rptr. at 642. As a threshold matter, the applicability of section 47(b) depends upon whether the statement was made in a judicial proceeding. See ITT Telecom Prod. Corp. v. Dooley, 262 Cal.Rptr. 773, 776 (Cal.Ct.App.1989). The letter was not sent in the context of a judicial or quasi-judicial proceeding, or actual good faith contemplation of litigation, as interpreted by California case law. Nor was it sent to achieve the objects of the litigation. Exhibit 52 was one in a series of newsletters sent to Nutri-Metics' Division and Unit Managers for informational purposes. See Financial Corp., 234 Cal.Rptr. at 661 ("The possible relationship of a listener or reader to anticipated litigation may determine whether the statement had some relation to it."). The privilege does not extend to communications to persons in no way connected with the proceeding. See Susan A. v. County of Sonoma, 3 Cal.Rptr.2d 27, 31 (Cal.Ct.App.1991).
 
 
 43
 The fact that the letter was sent a few months prior to the filing of this lawsuit, and included statements about Behring and Pollock, does not bring it within section 47(b). Although the letter was sent to some of the participants in this litigation, it was most widely disseminated among people with no connection to this litigation. Finally, at the time the letter was sent, it had no connection or logical relation to this action. Exhibit 52 became relevant to this litigation subsequently. Because the privilege in section 47(b) could not extend to Exhibit 52 as a matter of law, Nutri-Metics received a benefit from the district court's decision to submit that question to the jury, and the privilege could be rejected by the jury.
 
 3. Termination of Division Agreements
 
 44
 Nutri-Metics also challenges the district court's refusal to rule that the termination of Benson's and Anderson's Division Manager Agreements were privileged as a matter of law. We agree that Nutri-Metics has a legal right to seek performance under its contracts, and no liability will attach when it attempts to legitimately enforce the terms of its contract. Nevertheless, at trial, Gigi argued that Benson's and Anderson's agreements were terminated solely because they either contemplated, or engaged in, business with Gigi. It further argued that that was an improper basis for termination under those agreements, and the termination was for the single purpose of discouraging other distributors from dealing with Gigi.
 
 
 45
 Faced with conflicting evidence concerning the reason for the terminations, the district court properly submitted the question to the jury. It adequately instructed the jury on the privilege defenses available to Nutri-Metics, and correctly informed the jury that the burden was with Nutri-Metics to establish these defenses. The court told the jury that as long as Nutri-Metics acted lawfully to protect its own interests with the Avacare distributors, Benson and Anderson, it must find in favor of Nutri-Metics even though its actions intentionally disrupted the economic relationship Gigi had with its customers. Under the circumstances, the district court did not err in submitting this issue to the jury. The court's instruction fairly and adequately covered the issue and was a correct statement of the law.
 
 
 46
 4. Absolute Privilege for Investigation Activities
 
 
 47
 Nutri-Metics asserts that statements made by Lois Rajskup and Pat Davis during their "investigations" into Gigi's activities must be afforded the absolute privilege of section 47(b). Apparently, the calls made by Davis and Rajskup were made at the request of Nutri-Metics or its lawyers.
 
 
 48
 We agree that the absolute privilege in section 47(b) may extend to communications made during investigations. See, e.g., Financial Corp., 234 Cal.Rptr. at 660-61. Regardless, the privilege has no application to the statements made by Davis and Rajskup during their "investigations." Although California case law authorizes the privilege in the investigatory setting when the investigation is conducted by an authorized person and occurs in the context of the litigation or other quasi-judicial proceeding, Nutri-Metics' attempt to extend the privilege to the circumstances of Davis' and Rajskup's "investigation" is meritless.
 
 
 49
 First, it is patently clear that the privilege will not apply to the conduct of taping the telephone conversations. See Kimmel v. Goland, 271 Cal.Rptr. 191, 194-97 (1990). Nor will the privilege apply to the statements made by Davis and Rajskup during their investigations. Any statement made prior to the litigation does not even arguably meet any of the judicially created requirements for the application of the privilege. Similarly, the statements made during the pendency of the litigation cannot seriously be considered to have been made in a judicial or quasi-judicial proceeding, or in an attempt to achieve the objects of the litigation, or be related to the action. Merely because the statements were made during the pendency of the litigation does not mean they occurred in a judicial or quasi-judicial proceeding. As we stated earlier, the privilege does not extend to communications to persons in no way connected with the proceeding. See Susan A., 3 Cal.Rptr.2d at 31. Nor is a communication privileged unless it has some reasonable relevancy to the subject matter of the action. Silberg, 266 Cal.Rptr. at 647.
 
 
 50
 Perhaps even more curious is how the statements made by Davis and Rajskup under the guise of assumed names could possibly be related to the legal action or to achieve the purpose of the litigation. Any credible argument that these investigations had place in the litigation and should be protected by section 47(b) is undermined by the deception involved in carrying them out. For example, during cross-examination concerning one of these calls, Davis stated that her phone call in March 1987 to Anne Ayers, in which she posed as a customer, was "to get information as to the marketing plan."
 
 
 51
 Although we recognize the absolute privilege of section 47(b) is broad, the prerequisites must still be present. It is not automatic that once litigation is underway, any communication made by a participant, however remotely related, and in all contexts, will be afforded the absolute privilege. No instruction was required.
 
 C. Motions for Directed Verdicts
 
 52
 We review the district court's decision to deny a motion for a directed verdict de novo. See In re Hawaii Fed. Asbestos Cases, 960 F.2d 806, 816 (9th Cir.1992). A directed verdict should be granted only when the evidence permits but one reasonable conclusion as to the verdict. McGonigle v. Combs, 968 F.2d 810, 816 (9th Cir.1992).
 
 1. Business Torts
 
 53
 Nutri-Metics challenges the denial of its motion for directed verdict on the "business" torts. Apparently it contends that if the trial court had ruled correctly on its privilege defenses, none of the evidence that could support verdicts on those claims would have gone to the jury. Because we have already concluded that all the evidence challenged by Nutri-Metics should have been admitted, this challenge is meritless. We agree with Nutri-Metics that Exhibits 49 and 52, the termination of Benson's and Anderson's Division Manager Agreements, the investigation undertaken by Davis and Rajskup, and the stop selling demands could support a verdict in favor of Gigi's "business" tort claims. Certainly, this evidence, along with the permissible inferences the jury may have drawn from it, does not lead to but one conclusion. Therefore, the district court properly denied Nutri-Metics' motion for a directed verdict on these claims.
 
 
 54
 2. Intentional or Negligent Infliction of Emotional Distress
 
 
 55
 Nutri-Metics contends the district court erred when it denied its motion for a directed verdict against Gigi's claims for intentional and negligent infliction of emotional distress. According to Nutri-Metics, the record is totally devoid of any evidence that could establish a claim for intentional infliction, and the circumstances of this case do not bring it within the tort of negligent infliction as recognized by California law.
 
 
 56
 Even assuming the district court should have granted Nutri-Metics' motion for a directed verdict on these claims, we exercise our discretion to construe the general verdict in this case as attributable to the other theories submitted to the jury that were supported by substantial evidence. See Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 777 (9th Cir.1990); Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir.1980); accord Counts v. Northern R.R., 952 F.2d 1136, 1140 (9th Cir.1991). Notwithstanding the fact that one of the theories submitted to the jury lacks evidentiary support, we have discretion to "construe a general verdict as attributable to one of several theories if it was supported by substantial evidence and was submitted to the jury free from error."[7] Kern, 899 F.2d at 777. The factors to be considered in deciding whether to exercise this discretion are: (1) the potential for confusion of the jury; (2) whether the losing party's defenses apply to the count upon which the verdict is being sustained; (3) the strength of the evidence supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories. Id.; accord Counts, 952 F.2d at 1140.
 
 
 57
 Applying these factors, we conclude this is an appropriate case for the exercise of our discretion to uphold the jury's verdict. The claims for emotional distress were but two of the thirteen claims presented to the jury. Gigi's action focused in large part on the tort claims against Nutri-Metics concerning its alleged interference with Gigi's business. Much of the evidence relied upon by Gigi to show infliction of emotional distress, while perhaps not sufficient for those claims, would certainly support a verdict for the business tort theories. The same facts that were pertinent to the infliction of emotional distress claims were relevant to each of Gigi's theories. Indeed, the evidence relied upon by Gigi to support each theory was largely identical, except that its claims of infliction of emotional distress required the additional evidence of intentional and/or outrageous conduct. Most of Nutri-Metics' defenses applied equally to the emotional distress claims and the interference claims; namely, its good faith and reasonableness defenses, as well as, its privilege defenses. The jury was carefully and accurately instructed on the law and applicable defenses for each of the various claims submitted to them. The jury could not have found in favor of Gigi under any of its theories without rejecting these defenses and weighing the evidence in a light favorable to Gigi. Consequently, we will sustain the general verdict rendered by the jury on the basis that it was attributable to the numerous other counts properly submitted.
 
 D. Compensatory Damages Award
 
 58
 Nutri-Metics contends that the jury award for compensatory damages in the amount of $3.5 million dollars[8] was based upon speculation and there was not sufficient evidence to support the award. It challenges the fact of the lost profit award as well as the amount. Also, Nutri-Metics charges that the damage award for "hurt feelings" was excessive.
 
 
 59
 The responsibility of awarding compensation for an injury sustained is committed in large part to the jury. Cunningham v. Simpson, 81 Cal.Rptr. 855, 859 (1969). We may not interfere with the award unless it was excessive as a matter of law or the recovery was so grossly disproportionate as to raise a presumption that it was the result of passion or prejudice. See id.
 
 
 60
 In California, generally, the measure of damages for the breach of an obligation not arising from contract is the amount which will compensate for all the detriment proximately caused regardless of whether it could have been anticipated or not. Cal.Civ.Code § 3333. Here, the jury awarded Gigi $3.5 million on its counter-claims. With the exception of the award for breach of the employment contract, the damages awarded were based upon injuries arising from tortious conduct, not from contract.
 
 
 61
 Under section 3333 of the California Civil Code, damages may be awarded for lost profits. See French v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 784 F.2d 902, 909 (9th Cir.1986); cf. Natural Soda Products Co. v. City of Los Angeles, 143 P.2d 12, 17 (Cal.1943) (award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what probable earnings would have been with the tort), cert. denied, 321 U.S. 793 (1944). An award for lost profits is proper when the evidence establishes "with reasonable certainty both their occurrence and the extent thereof." Maggio, Inc. v. United Farm Workers of Am., 278 Cal.Rptr. 250, 264 (Cal.Ct.App.) (quotations omitted), cert. denied, 112 S.Ct. 187 (1991). "Anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." Grupe v. Glick, 160 P.2d 832, 840 (Cal.1945); accord Edwards v. Container Kraft Carton Co., 327 P.2d 622, 626-27 (Cal.1958).
 
 
 62
 At trial, there was extensive expert testimony admitted concerning past performances and earnings by Behring and Pollock, Gigi's sales history, future projections, and the bases for those projections. We conclude the compensatory damages award for lost profits was supported by substantial evidence. See Transgo, Inc. v. Ajac Trans. Parts Corp., 768 F.2d 1001, 1024 (9th Cir.1985), cert. denied, 474 U.S. 1059 (1986). The cases relied upon by Nutri-Metics do not support a contrary conclusion. See, e.g., Gerwin v. Southwestern Cal. Assoc. of Seventh Day Adventists, 92 Cal.Rptr. 111 (Cal.Ct.App.1971) (lost profits not allowed for a hotel that never opened); Macmorris Sales Corp. v. Kozak, 69 Cal.Rptr. 719 (Cal.Ct.App.1968) (lost profits not allowed for a business that was only in operation for a few days).
 
 
 63
 Nor can we say the award for hurt feelings was excessive. There was considerable evidence presented at trial concerning the personal injuries suffered by Behring and Pollock, including pain and suffering and injury to their personal reputations. It is undisputed that these items of damages are available to plaintiffs in a tort action. Further, we cannot tell from a lump sum award the exact amount awarded for each item of damages, under which claim it was awarded, and to whom it was awarded. Sufficient evidence was presented at trial to support the compensatory award under the claims that were properly submitted.
 
 E. Punitive Damages Award
 
 64
 Nutri-Metics contends the punitive damages award was unsubstantiated and excessive. Alternatively, it asserts the award violated due process. Essentially, Nutri-Metics argues that if the court does not consider certain evidence, namely, Exhibits 49 and 52, the stop selling demand statements, the determination that the Noncompetition Agreement was not breached, the statements made during its "investigation", and the termination of Benson's and Anderson's Agreements, there was no evidence of malice, fraud, or oppression to support an award for punitive damages.
 
 
 65
 The determination whether to award punitive damages is "within the exclusive province of the jury." Transgo, Inc., 768 F.2d at 1024 (applying California law). Under California law, we may reverse an award of punitive damages only where it appears from the entire record, as a matter of law, that the award was excessive or so grossly disproportionate as to raise a presumption that it resulted from passion or prejudice. Neal v. Farmers Ins. Exchange, 148 Cal.Rptr. 389, 399 (1978).
 
 
 66
 By statute, California provides for an award of punitive damages in an action for breach of an obligation not arising from contract, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal.Civ.Code § 3294. Public policy permitting punitive damages awards in California is to prevent future misdeeds by punishing the wrongdoers and making an example out of them for others not to follow. Adams v. Murakami, 284 Cal.Rptr. 318, 320 (1991). There must be a reasonable relationship between 1) the award's size and the reprehensibility of defendant's conduct; 2) the injuries suffered by the plaintiff; and 3) the defendant's net worth. Las Palmas Assoc. v. Las Palmas Ctr. Assoc., 1 Cal.Rptr.2d 301, 321 (Cal.Ct.App.1991). Most important on appeal is whether the amount of the punitive damages award will have a deterrent effect without being excessive. Adams, 284 Cal.Rptr. at 321.
 
 
 67
 Here, Nutri-Metics does not challenge the amount of punitive damages award as excessive; rather, it challenges the basis for the award. During its instructions to the jury, the court outlined the requirements for awarding punitive damages, including the definitions of the terms used in section 3294. In the first phase of a bifurcated proceeding, the jury responded in the affirmative to a special interrogatory asking whether Gigi established by clear and convincing evidence that Nutri-Metics had acted with malice, oppression, and fraud. During phase two, the jury indicated that no portion of the compensatory award had included an amount for punitive damages.
 
 
 68
 The record is replete with evidence properly admitted at trial to support the jury's finding that both Walter and Nobbs (as Nutri-Metics) acted with malice, oppression, and fraud. Moreover, we conclude that the punitive damages award is commensurate with Walter's and Nobbs' (as Nutri-Metics) conduct, Gigi's harm, and Nutri-Metics' net worth. Nor was the award excessive under the circumstances. Additionally, we reject Nutri-Metics' contention that the award for punitive damages violated due process. See Pacific Mut. Life Ins. Co. v. Haslip, 111 S.Ct. 1032, 1043-46 (1991); Glovatorium, Inc. v. NCR Corp., 684 F.2d 658, 663 n. 5 (9th Cir.1982); Maheu v. Hughes Tool Co., 569 F.2d 459, 480 (9th Cir.1977) (due process challenge to California Civil Code § 3294 rejected).
 
 
 69
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Nutri-Metics may seek relief before the district court from the judgment of voluntary dismissal with prejudice for reasons of "mistake, inadvertence, surprise, or excusable neglect" under Fed.R.Civ.P. 60(b)(1). Seidman, 785 F.2d at 1448 n. 3
 
 
 [2]
 Gigi contends that Nutri-Metics waived this issue. We disagree. Throughout the proceedings, Nutri-Metics objected to the court's determination that its Order granting Carrington's motion for partial summary judgment was dispositive. The stipulation between the parties that was read to the jury was agreed upon at the court's request. Although Nutri-Metics consented to the court again informing the jury of the partial summary judgment at the close of trial, it renewed its objection to the court's grant of summary judgment and asked that it be vacated. See Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1430-31 (9th Cir.1986); see also Brown v. Avemco, 603 F.2d 1367, 1373-74 (9th Cir.1979)
 Additionally, Nutri-Metics vigorously opposed Carrington's and Gigi's motions to exclude evidence concerning direct sales. The court granted this motion prior to trial and ruled that it would exclude evidence offered to prove whether or not Gigi and/or Carrington were involved in direct sales. We conclude that Nutri-Metics' challenge was preserved.
 
 
 [3]
 When interpreting the Noncompetition Agreement, we apply the substantive rules of California contract law. The Purchase Agreement states that both that Agreement and the Noncompetition Agreement shall be interpreted under California law. While the Noncompetition Agreement itself states that the interpretation of that Agreement "shall be governed by the laws of any state ... in which Nutri-Metics seeks to enforce this Agreement[,]" the inconsistency need not be resolved here because Nutri-Metics brought this action in California
 
 
 [4]
 We think this requirement survived the elimination of the "interests of justice" test. See Silberg, 266 Cal.Rptr. at 645-46 (noting that the court in Fuhrman v. California Satellite Sys., 231 Cal.Rptr. 113 (Cal.Ct.App.1986), properly found no privilege because the communication was not made in the course of a judicial proceeding); see also Financial Corp. of Am. v. Wilburn, 234 Cal.Rptr. 653, 660 (Cal.Ct.App.1987) (This decision, in which a California appellate court rejected the "interests of justice" requirement yet retained the requirement that prelitigation statements are privileged only if speaker is actually in good faith contemplating litigation, was cited with approval by the Court in Silberg.)
 
 
 [5]
 As an evidentiary matter, the district court properly admitted the demand statements. Although section 47(b) bars most tort causes of action which are predicated on judicial statements or publications themselves, it does not create an evidentiary privilege for such statements. Oren Royal Oaks v. Greenberg, Bernhard, Weiss & Karma, Inc., 728 P.2d 1202, 1208 (Cal.1986). In Oren, the California Supreme Court distinguished the privilege in section 47(b) from evidentiary privileges and explained that "when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent."
 Here, the stop selling demand statements constituted only part of the factual basis for Gigi's tort claims, and was offered simply as evidence to establish an element of the tort. Consequently, the district court properly admitted the statements, and no limiting instruction was required.
 
 
 [6]
 We note the stipulated jury instructions included the "interests of justice" requirement. The California Supreme Court has conclusively rejected that requirement. See Silberg, 266 Cal.Rptr. at 645-46. Although Nutri-Metics relies on Silberg throughout its opening brief, it does not challenge the substance of the stipulated instruction, but merely challenges the fact of it. Therefore, we exercise our discretion to refrain from deciding whether the stipulated jury instruction, as given, constituted reversible error. See Fed.R.App.P. 28(a)(4); Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir.1990) (Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief)
 
 
 [7]
 We are aware of our court's statement in Brett v. Hotel, Motel, Restaurant, Constr. Camp Employees and Bartenders Union, 828 F.2d 1409 (9th Cir.1987), that where a general verdict is rendered, and "the evidence fails to support the verdict under one of the plaintiff's theories, we may not affirm the verdict even though the jury could properly have granted relief based on a separate theory." Id. at 1416 (citing Syufy Enters. v. American Multicinema, Inc., 793 F.2d 990, 1001 (9th Cir.1986), cert. denied, 479 U.S. 1031 and 1034 (1987)). While Syufy did state that as a rule, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury, it also recognized that our court has held that when one but not all of the theories submitted to the jury lacks evidentiary support, " 'the reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error.' " 793 F.2d at 1001 (quoting Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir.1980)) (emphasis added)
 
 
 [8]
 The total award for compensatory damages was $3,535,156. Nutri-Metics explains that $35,156 was the amount awarded for the breach of the employment contract claim. With the exception of that claim, the causes of action upon which the damages award was predicated all sounded in tort. We note that it is impossible to determine what amount of the lump sum compensatory award was attributable to which claim and to whom it was awarded